CLARK OIL & REFINING COMPANY, Appellant, V. LIDDICOAT and others, Respondents.

No. 300. Argued October 31, 1974.—Decided November 26, 1974.
(Also reported in 223 N. W. 2d 530.)

For the appellant there were briefs by *Aul & Tesch,* attorneys, and *Thomas E. Aul* and *Karyn K. Driessen* of counsel, all of Milwaukee, and oral argument by *Thomas E. Aul.*

For the respondent Transport Oil Co., Inc., there was a brief and oral argument by *Aubrey R. Fowler* of Madison.

HEFFERNAN, J. This case involves the priority of a judgment lien creditor, Clark Oil and Refining Company, as against a creditor, Transport Oil Company, Inc., who placed goods in the hands of the debtor, Gilmore W. Liddicoat, on a "consignment" basis. We conclude that, under the circumstances of this case, where the facts show that the intent was to use the consignment as a security device, it was not a true consignment, and in the absence of filing, as required by ch. 409, Stats., Uniform Commercial Code, the rights of an attaching judgment creditor were not subordinate to the consignment. We also conclude that the evidence fails to show that the lien creditor had actual knowledge that the gasoline held by the debtor was the property of Transport rather than the debtor.

The entire transaction, in view of its nature as a security device, is to be tested by ch. 409, Stats., Uniform Commercial Code.

The defendant, Liddicoat, was a filling station operator, operating under his own name and pursuant to various municipal licenses that were granted to him personally. The record shows that the Clark Oil and Refining Company obtained a judgment against Liddicoat on May 27, 1971, for the price of petroleum products previously sold. For reasons not apparent in the record, Clark and Liddicoat terminated their business relationship; and in October of 1969, Liddicoat commenced doing business with the Transport Oil Company, Inc. Under this new relationship, which was formalized by a filling station lease and an automotive gasoline agreement, Transport Oil thereafter supplied gasoline to Liddicoat.

On September 8, 1972, Clark secured the issuance of a writ of attachment, directing the sheriff of Dane county to seize Liddicoat's property for the purpose of satisfying

its judgment. The sheriff executed the attachment on September 21, 1972, by seizing gasoline valued at about $6,600—more than enough to satisfy Clark's judgment. On the same day, Transport Oil Company and Capitol Indemnity Company posted a $12,000 redelivery bond, and the gasoline was released from the attachment. Clark then brought proceedings in the circuit court for Milwaukee county to show that Liddicoat was the owner of the gasoline and to compel Transport Oil and Capitol Indemnity to indemnify Clark out of the amount of the bond which they had posted to release the attachment.

Transport claimed that, by virtue of a consignment, the gasoline remained its property and was not subject to Clark's attachment.

The hearing before the circuit judge consisted of affidavits. No testimony was taken.

Clark's status as a judgment creditor is uncontested. It is also uncontested that no liens, security interests, or financing statements showing an interest of anyone other than Liddicoat were ever recorded or filed, as required by ch. 409, Stats., either in the office of the register of deeds or in the office of the secretary of state.

Transport Oil argued that, irrespective of what section of the Uniform Commercial Code was applied to this transaction, Clark Oil, as a corporation doing business on a regular basis with retail gasoline dealers, ought to have known that it was contrary to the usual course of business for any supplier of gasoline to relinquish possession of gasoline to a retail dealer without the retention of title.

The trial judge decided this case under the provisions of ch. 402, Stats., Uniform Commercial Code.[1] The judge,

---

[1] Sec. 402.326, Stats., provides:

"**Sale on approval and sale or return; consignment sales and rights of creditors.** (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

in analyzing the transaction under the terms of sec. 402.326, found that Liddicoat did business under his own name as a sole proprietor, *i.e.*, he engaged in business under a name other than that of the person making the delivery (Transport). He concluded that Wisconsin provides for no sign law of the kind contemplated by sec. 402.326 (3) (a). In reference to sec. 402.326 (3) (b), the trial judge found that there was no evidence established by Transport to show that Liddicoat was known by his creditors to be substantially engaged in the selling of goods of others. He found that Transport had not complied with the filing provisions of ch. 409.

---

"(a) A 'sale on approval' if the goods are delivered primarily for use; and

"(b) A 'sale or return' if the goods are delivered primarily for resale.

"(2) Except as provided in sub. (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

"(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. This subsection is applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum'. However, this subsection is not applicable if the person making delivery:

"(a) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

"(b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

"(c) Complies with the filing provisions of ch. 409.

"(4) Any 'or return' term of a contract for sale is to be treated as a separate contract for sale within s. 402.201 and as contradicting the sale aspect of the contract within s. 402.202 on parol or extrinsic evidence."

At this point in the trial judge's analysis, if ch. 402, Stats., were in fact applicable, it would appear that Clark should have been accorded priority of its claim over that of Transport. The trial judge concluded, however, that Clark was not entitled to priority under ch. 402, because Clark had extended its credit to Liddicoat before Liddicoat had possession of Transport's gasoline and, accordingly, Clark could not have relied on Liddicoat's ostensible ownership of Transport's gas at the time Clark originally extended credit.

We disagree with the trial judge's conclusion that ostensible ownership is of importance only at the time credit is originally extended. It may well be of equal importance at a later date, when an unpaid creditor forbears collective efforts because he is relying on the apparent ownership of property in the hands of the debtor. Ostensible ownership may have a considerable effect upon the course of the relationship between a debtor and creditor in respect to an obligation previously incurred. *See,* William D. Hawkland, *A Transactional Guide to the Uniform Commercial Code,* p. 751.

We conclude, therefore, that even though the transaction were one to which ch. 402, Stats., was applicable, Clark Oil should have prevailed because no security agreement was ever filed. However, we conclude that the trial judge erred at the very outset of his analysis, because he viewed the transaction as a true consignment, governed by ch. 402, while in fact the parties intended the consignment as a security device only and which was governed by ch. 409.

This functional analysis for determining the nature of the transaction was adopted by this court in *Columbia International Corp. v. Kempler* (1970), 46 Wis. 2d 550, 175 N. W. 2d 465. In that case, this court made an extensive analysis of the nature of consignments under the Uniform Commercial Code. That analysis was based upon

a methodology suggested by Hawkland, *A Transactional Guide to the Uniform Commercial Code, supra.* In *Columbia,* citing Hawkland, we said:

" '. . . consignments under the Code are to be regarded as security interests governed by [ch. 409], unless the parties have intended them not to be secured transactions, *in which case they are governed by [ch. 402].*' " (Brackets in *Columbia*) (P. 562)

The intent of the parties may be determined by the function that the consignment is intended to perform. A consignment can be used as a security device when the goods go to a merchant who is unable to risk finding a market for the goods and the title remains in the consignor, or it may be used as a price-fixing device by the consignor.

Where the function of the arrangement is to assure retail price maintenance, a consignment is generally referred to as a true consignment. By the use of that device, it is intended that the goods belong to the consignor even though they have been delivered to the dealer for resale purposes. The consignor, because the goods remain his own, can determine the price at which they will be sold.

Under the agreement entered into between Liddicoat and Transport Oil, Liddicoat had the right and the duty to determine the price at which he sold the gasoline. That agreement and the practice between Liddicoat and Transport Oil negative any inference that the arrangement was a true consignment. If the consignment involves a delivery of goods to a merchant who has been induced to accept them by an agreement from the consignor which permits their return in lieu of payment if they are not resold, the arrangement is a security consignment, as contrasted to a true consignment. The retailer pays for the goods when they are resold. If he is unable to sell them, he simply does not pay for the goods. They may

be returned. The consignor is exposed to a risk in this type of a transaction, because he has given up possession of the goods without receiving payment. However, as *Columbia*, page 559, points out, in order to provide security to the consignor, title remains in him. Accordingly, the general (nonlien) creditors of the consignee are subordinate to the superior title of a consignor.

The facts show that the consignment between Liddicoat and Transport was a security arrangement only and accordingly is governed by ch. 409, Stats. Title was to remain in Transport. Transport had the option of accepting payment for the gasoline if sold or to take the return of the gasoline. The price was to be determined by Liddicoat. Payment was to be made by Liddicoat only on the basis of sales and at the tank wagon price, irrespective of the retail sales price. This arrangement between Liddicoat and Transport was intended only for security purposes and was not intended to effectuate a sale of Transport's gasoline by an agent.

Although counsel for Transport apparently argued at trial that this transaction came under ch. 402, Stats., he acknowledged at oral argument on this appeal that this arrangement did not have as its purpose price maintenance but was intended only as a security device. This position, ultimately taken by Transport's counsel, is correct. Unfortunately, as far as the record reveals, this court's holding in *Columbia* was never brought to the attention of the trial court by either counsel, despite the fact that it had been decided three years before the issuance of the trial judge's order. Although Clark, on this appeal, bases its argument upon the *Columbia Case*, the respondent, Transport, does not refer to it and ignores its teaching. Under the analysis of *Columbia*, once it is determined that it was the intention of the parties to enter into a security arrangement, the disposition of the case is governed by ch. 409.

The sections of ch. 409, Stats., pertinent to this controversy are:

"**409.301 Persons who take priority over unperfected security interests; 'lien creditor.'** (1) Except as otherwise provided in sub. (2), an unperfected security interest is subordinate to the rights of:

"(a) Persons entitled to priority under s. 409.312;

"(b) A person who becomes a lien creditor without knowledge of the security interest and before it is perfected;

" . . .

"(2) If the secured party files with respect to a purchase money security interest before or within 10 days after the collateral comes into possession of the debtor, he takes priority over the rights of a transferee in bulk or of a lien creditor which arise between the time the security interest attaches and the time of filing.

"(3) A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes an assignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment. Unless all the creditors represented had knowledge of the security interest such a representative of creditors is a lien creditor without knowledge even though he personally has knowledge of the security interest."

Clark was a lien creditor, and because Transport failed to comply with the requirements of filing, its security interest was subordinate to Clark's rights as an attaching judgment creditor. Ch. 409, Stats., also provides that, where there is a consignment for security purposes, even an attaching judgment cerditor will not be superior to a secured consignor unless he became a lien creditor without knowledge of the consignor's interest that was prior in time.

Transport's counsel, on appeal, although apparently now conceding that ch. 409, Stats., is applicable, argues that Clark had knowledge of the security interest of

Transport, and therefore could not gain priority status in this controversy. Transport argues that, because Clark was itself a wholesale gasoline supplier, it knew, or should have known, that Transport had some security interest in the gasoline. Transport argues that such "knowledge" will defeat the lien creditor's claim of priority over Transport's unfiled security interest. He also argues that, since there was some reason for Clark to know or to believe that some other wholesaler might have protected himself by an unfiled security or consignment arrangement, Clark had a duty "to make a simple telephone call to [T]ransport to clarify the situation."

As has been frequently pointed out, the Uniform Commercial Code is a "code." The very use of that term implies that the rights and duties of the parties whose conduct is governed by the code will be defined, and their liabilities determined, by the code itself. Nowhere has Transport cited any provision of the code that requires the inquiry which it now maintains should have been carried out by Clark.

The code operates to subordinate even a lien creditor without knowledge of the unsecured interest of a consignor if the consignor files, as required by sec. 409.301 (2), Stats. However, in the absence of such filing, a lien creditor is entitled to priority if he becomes a lien creditor without knowledge of the security interest and before filing.

Knowledge is defined by the code, sec. 401.201 (25a), Stats., which provides in part:

"A person 'knows' or has 'knowledge' of a fact when he has *actual knowledge* of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know." (Emphasis supplied.)

By this definition, it is apparent that the framers of the code required proof of actual knowledge on the part

of the lien creditor if he is to be subordinated to the holder of an unfiled security interest. Whether the judgment creditor had reason to know, or might have been alerted to, circumstances that should reasonably have impelled him to check beyond the filed record is irrelevant under the code. Only if it were shown that there was actual knowledge of Transport's security interest, would Clark as a lien creditor be subordinate to it. The trial judge found that such actual knowledge was never alleged or proved.

The disposition of this case is controlled by this court's holding in *Columbia, supra.* No attempt has been made by the respondent, Transport Oil Company, to question the rationale of *Columbia.* The facts show that Clark is a judgment lien creditor without actual knowledge of Transport's unfiled security interest. As such, it is entitled to the proceeds of its attachment, to the extent of its judgment and costs, from the redelivery bond posted by Transport and Capitol Indemnity.

*By the Court.*—Order reversed, and cause remanded for further proceedings consistent with this opinion.